UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JASON ALAN BROWN,

        Plaintiff,

v.

MATTHEW MACAULEY et al.,

        Defendants.
_____/

Case No. 1:18-cv-986

Honorable Janet T. Neff

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez,* 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Avery, Lane, Ball, Ekagwu, Madison, and Vanderweil.

## Discussion

    I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan.

The events about which he complains, however, occurred at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan and the Muskegon Correctional Facility (MCF) in Muskegon, Muskegon County, Michigan. Plaintiff sues the following IBC employees: Deputy Warden Matthew Macauley, Resident Unit Manager Rufus Wright, Assistant Resident Unit Supervisor Larry Avery, Assistant Resident Unit Supervisor Wendy Lane, Security Classification Committee (SCC) member Unknown Party #1 named as John Doe #1, SCC member Unknown Party #2 named as Jane Doe #2, and Corrections Program Coordinator Unknown Ball. Plaintiff also sues the following MCF employees: Corrections Officer Unknown Ekagwu, Corrections Officer Unknown Madison, and Corrections Officer Unknown Vanderweil.

Plaintiff alleges that on June 20, 2014, while he was housed at Bellamy Creek Correctional Facility (IBC), he got a new roommate who Plaintiff refers to as "Inmate #2." Inmate #2 claimed that he had been transferred from the Michigan Reformatory for "squeezing a white bunkie out of his property." That night, Inmate #2 told Plaintiff that he was a high ranking member of a race-based, militant religious organization and a gang banger. Inmate #2 told Plaintiff that he needed to share his television with him and give him oral sex, or Inmate #2 would make sure he was either placed in segregation or transferred.

The next morning, Plaintiff reported the incident to Defendant Lane, who stated that she would have Plaintiff moved as soon as possible. Plaintiff states that the next couple of nights, Inmate #2 attempted to coax Plaintiff into giving him oral sex while standing naked and masturbating. Plaintiff again complained to Defendant Lane, who told Plaintiff that he was bigger than Inmate #2 and that he should be able to defend himself. Plaintiff continued to suffer from harassment from Inmate #2 on a nightly basis. Inmate #2 also told Plaintiff that there was a hit out on him and that he would protect Plaintiff if he gave him a blow job. Inmate #2 began sitting

on the sink and sharpening a knife while he threatened to stab Plaintiff for refusing to give him oral sex.

Plaintiff continued to report the harassment to Defendant Lane, who told Plaintiff that she was too busy to move him now and that the move had to be approved by Defendant Wright. Plaintiff's friend, Inmate #3, told Plaintiff that the only way to resolve the problem was to smash Inmate #2's head in while he was sleeping, and that if Plaintiff did not do that he would be preyed on by other inmates for the rest of his life. Eventually, Inmate #3 stopped talking to Plaintiff because he would not attack his roommate while he slept. Inmate #2 eventually heard about Inmate #3's advice to Plaintiff. Inmate #2 told Plaintiff that the three of them were going to have a conversation and that one of them would be leaving the compound or both Plaintiff and Inmate #3 would be stabbed.

Inmate #2 told Plaintiff that if he did not pay him $85, he would make sure that Plaintiff got butchered. Plaintiff stated that he did not have enough money to pay Inmate #2. Inmate #2 arranged a meeting between Plaintiff, Inmate #3, and himself in the yard. The three met at a picnic table and, as they were sitting down, Inmate #3 struck Plaintiff in the temple, cutting his temple and breaking his glasses. Plaintiff got up and went to the inside of the unit, where he washed the blood off his face. Shortly thereafter, Corrections Officer Gaskill told Plaintiff that he was moving to a different cell. Plaintiff told Gaskill that he had misplaced his cell key and asked him to open the door for him so he could pack up. When Plaintiff and Gaskill arrived at the cell, they observed Inmate #2 unhooking Plaintiff's television while his friend was grabbing Plaintiff's typewriter and fan. Corrections Officer Gaskill joked that Inmate #2 wanted Plaintiff out so badly that he was packing up his stuff for him. Gaskill then ordered Inmate #2's friend to leave and told Plaintiff that he would be moving after count.

As Plaintiff began to pack his property, he noticed that much of his property was already gone. Inmate #2 was angry that neither Plaintiff nor Inmate #3 had been taken to segregation and told Plaintiff that he would not last one more day in the compound. He attempted to wrestle the television from Plaintiff, but Plaintiff would not relinquish it. Inmate #2 then told Plaintiff that he would get the television from his next bunkie.

Once in his new room, Plaintiff was afraid of retaliation by Inmate #2 or his friends and stayed in his cell for a couple of days in order to hide the bruises and avoid questions by staff. Defendant Ball called Plaintiff out to review a grievance he had filed for failing to give him a legal footlocker. When Defendant Ball asked him about the bruises, Plaintiff broke down and told her the entire story. Plaintiff also told Defendant Ball that he was afraid to sleep at night, to be moved, to go to the yard, or to go back to work in the kitchen. Defendant Ball stated that she could not believe that Defendant Lane had taken so long to act on Plaintiff's complaints.

When Plaintiff returned to his cell, his roommate told him that Inmate #2 and a couple of "really big black guys" had come to the cell and demanded that he open the door. Plaintiff's roommate had pretended to be asleep. The next day, Defendant Gaskill called Plaintiff to the base and told him to go speak with Defendants Wright and Avery about his bruised face and previous kites. Defendant Wright told Plaintiff that he had been made aware of the entire chain of events and that he had to talk with Defendant Macauley about placing Plaintiff in either segregation or protective custody. Defendant Wright told Plaintiff that he had heard that Inmate #2's religious organization had ordered him to stab Plaintiff in order to prove that Inmate #2 was not a "fag."

Plaintiff asked if he was transferred, would Defendant Wright make sure that Inmate #2 was never placed in the same facility with Plaintiff again. Defendant Wright told Plaintiff that in order for a SPON [Special Problem Offender Notice] to be placed in his file,

4

Plaintiff would have to tell officials everything that had happened and be willing to sign a statement. Otherwise, Plaintiff would be placed in protective custody for two years. Plaintiff completed a written statement and signed it. Plaintiff was told that he would be temporarily placed in segregation and then transferred within a couple of weeks.

After leaving Defendant Wright's office, Corrections Officer Gaskill told Plaintiff that he needed to do a mock pack-up. Plaintiff knew that this meant he was going to segregation. Plaintiff complied and was placed in cuffs just as the rest of the unit was being called for chow. As the entire unit walked by, other inmates yelled that Plaintiff was a "snitch," and that he was being locked up for protection because his cellmate was making Plaintiff "blow" him. As Plaintiff was being led to segregation, Corrections Officer Gaskill told other staff that Plaintiff was being locked up because his cellmate had been pressing him for oral sex and money. This caused officers in segregation to mock Plaintiff on a daily basis.

A week later, Plaintiff was seen by the Security Classification Committee (SCC), which consisted of Defendants Macauley, Unknown Party #1 John Doe, and Unknown Party #2 Jane Doe. Defendant Macauley told Plaintiff that he was being transferred out of the facility for his own protection and that Inmate #2 would be noted in Plaintiff's file as a SPON. Defendant Macauley further stated that he would normally place Plaintiff in protective custody for long term protection in a situation with an organization the size of Inmate #2's religious organization, but that he was not doing so in this case because of Defendant Wright's agreement with Plaintiff. Defendant Macauley also indicated that Inmate #3 should be in Plaintiff's file as a SPON.

In July of 2014, Plaintiff was transferred to the Muskegon Correctional Facility (MCF), where he helped to reorganize AA [Alcoholics Anonymous] and got new NA [Narcotics Anonymous] step meetings started. Plaintiff states that his time at MCF was peaceful and

5

productive until October 15, 2015, when Inmate #2 showed up and assaulted Plaintiff by stabbing him from behind while Plaintiff was in the yard. It was dusk at the time of the assault, and Plaintiff did not get a good look at his assailant. Therefore, Plaintiff was initially not sure about his assailant's identity.

When Plaintiff returned to his cell, his roommate told him that three or four gang bangers had come to the door with knives and told him to get out. Plaintiff saw that his television was missing and his footlocker and wall locker had been opened. Plaintiff then went and told the officers on duty that he needed medical attention.

Plaintiff was taken to medical, where he was interviewed by Sergeant Gonzales. Sergeant Gonzales ordered Defendant Vanderweil to go secure Plaintiff's room and property. Around midnight, Plaintiff was given a pack-up receipt, but it did not have any of Plaintiff's personal property listed, just his clothing. Plaintiff kited Assistant Resident Unit Supervisor Sowe to ask about the pack-up slip, but did not receive a response. A couple of days later, Sergeant Gonzales told Plaintiff that they had recovered his television. Sergeant Gonzales explained that camera footage showed inmates ransacking Plaintiff's room during a two-hour period after Plaintiff went to medical because, for some reason, it had taken Defendant Vanderweil three to four hours to secure the room. Plaintiff claims that Defendants Ekagwu and Madison also failed to secure Plaintiff's room and property in violation of MDOC policy, leading to Plaintiff's loss of property. Sergeant Gonzales told Plaintiff that there was no SPON in Plaintiff's file for Inmate #2, who had recently been transferred to MCF.

A day or two later, Plaintiff was approached by Inmate #2, who said, "I told you that you couldn't hide from me and that I would get your bitch ass and all of your shit." Later that day, Inmate #2 again approached Plaintiff, stating that Plaintiff should have just given him a blow

6

job. Corrections Officers White and Abbatoy laughed at Plaintiff and taunted him by saying that Inmate #2 was pulling Plaintiff's "hoe card."

Plaintiff was subsequently interviewed by the SCC and was transferred to LCF. Plaintiff was transferred back to IBC in July of 2017, and then to the Marquette Branch Prison (MBP) in June of 2018. While confined at IBC, Plaintiff spoke to Defendant Wright about getting a SPON on Inmate #2 placed in his file, as Plaintiff had been promised. Defendant Wright stated that Defendant Macauley was responsible for placing a SPON in a prisoner file, and that Defendant Wright had nothing to do with it. Defendant Wright stated that he had shared his thoughts on the matter with Defendant Macauley, and that there was nothing more he could do.

Plaintiff states that he still has not been given a SPON with regard to Inmate #2, despite repeatedly kiting and grieving the issue. Plaintiff claims that Defendants acted with deliberate indifference to his safety. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

II. Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Defendants Avery, Lane, and Ball

Plaintiff's claims against Defendants Avery, Lane, and Ball are barred by the applicable statute of limitations. State statutes of limitations and tolling principles apply to determine the timeliness of claims asserted under 42 U.S.C. § 1983. *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985). For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* Mich. Comp. Laws § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2,

1999). Accrual of the claim for relief, however, is a question of federal law. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer*, 98 F.3d at 220.[1]

Plaintiff's claims against Defendants Avery, Lane, and Ball are untimely. He asserts claims arising in June and July of 2014. Plaintiff had reason to know of the "harms" done to him by these Defendants at the time they occurred. Hence, his claims accrued in 2014. However, he did not file his complaint until August 28, 2018, well past Michigan's three-year limit. Moreover, Michigan law no longer tolls the running of the statute of limitations when a plaintiff is incarcerated. *See* Mich. Comp. Laws § 600.5851(9). Further, it is well established that ignorance of the law does not warrant equitable tolling of a statute of limitations. *See Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991); *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991); *Mason v. Dep't of Justice*, No. 01-5701, 2002 WL 1334756, at *2 (6th Cir. June 17, 2002).

If the allegations against a named defendant show "that relief is barred by the applicable statute of limitations, the [claims against that defendant are] subject to dismissal for failure to state a claim . . . ." *Jones v. Bock*, 549 U.S. 199, 215 (2007). Therefore, the Court will dismiss Defendants Avery, Lane, and Ball from this action.

---

[1] 28 U.S.C. § 1658 created a "catch-all" limitations period of four years for civil actions arising under federal statutes enacted after December 1, 1990. The Supreme Court's decision in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004), which applied this federal four-year limitations period to a suit alleging racial discrimination under § 1981 does not apply to prisoner claims under 28 U.S.C. § 1983 because, while § 1983 was amended in 1996, prisoner civil rights actions under § 1983 were not "made possible" by the amended statute. *Id.* at 382.

### B. Defendants Ekagwu, Madison, and Vanderweil

Plaintiff claims that Defendants Ekagwu, Madison, and Vanderweil failed to secure his room and property in a prompt fashion following his assault at MCF in violation of MDOC policy and the orders of superior officers.

The Court notes that Plaintiff's allegations with regard to Defendants Ekagwu, Madison, Vanderweil fail to show that Wright engaged in any misconduct toward Plaintiff. In addition, these claims are barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivations of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon allegedly negligent acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Moreover, numerous state post-deprivation remedies are available to him. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. Mich. Dep't of Corr., Policy Directive

04.07.112, ¶ B (effective Dec. 12, 2013). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. Mich. Comp. Laws § 600.6419; MDOC Policy Directive 03.02.131 (effective Oct. 21, 2013). Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." Mich. Comp. Laws § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Accordingly, Plaintiff's claims against Defendants Ekagwu, Madison, and Vanderweil will be dismissed.

### C. Defendants Macauley, Wright, and Unknown Parties #1 and #2

Plaintiff claims that Defendants Macauley, Wright, Unknown Party #1, and Unknown Party #2 were deliberately indifferent to his safety when they failed to place a SPON in his file with regard to Inmate #2. Plaintiff states that this failure caused him to be stabbed while at MCF and continues to place Plaintiff at risk of being assaulted in the future. Because Plaintiff did not become aware of this failure until October of 2015, these claims are not barred by the statute of limitations. *Collyer*, 98 F.3d at 220.

As asserted by Plaintiff, inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To establish a violation of this right, Plaintiff must show that Defendant was deliberately indifferent to the Plaintiff's risk of injury. *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 880-81

11

(6th Cir. 1988). While a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, he must at least establish that he reasonably fears such an attack. *Thompson v. Cty. of Medina*, 29 F.3d 238, 242-43 (6th Cir. 1994) (holding that plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety.")

The Court concludes that Plaintiff's claims against Macauley, Wright, Unknown Party #1, and Unknown Party #2 are not clearly lacking in merit and may not be dismissed on initial review.

### III. Pending motion to amend

Plaintiff has filed a "motion to amend with alteration Plaintiff's motion to file redacted complaint under seal" (ECF No. 12). Plaintiff seeks an order allowing the redacted complaint to be filed. However, the Court notes that the redacted complaint has already been filed as the complaint in this case (ECF No. 1). The unredacted version of the complaint was filed as a supplemental document (ECF No. 5). To the extent that Plaintiff is seeking to have the unredacted version of his complaint removed from the record, such relief is properly denied for the reasons stated in the October 30, 2018, order denying Plaintiff's "motion to allow unredacted complaint to be filed under seal" (ECF No. 8).

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Avery, Lane, Ball, Ekagwu, Madison, and Vanderweil will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

An order consistent with this opinion will be entered.


Dated: January 7, 2019 /s/ Janet T. Neff
Janet T. Neff
United States District Judge